## STEWART *v.* POTOMAC FERRY CO.

*(Circuit Court, E. D. Virginia. March, 1882.)*

1. ATTACHMENT OF VESSEL—STATE LAW—CONFLICT WITH JUDICIARY ACT.

   A state law which, for a cause of action clearly maritime, either of contract or tort, arising on or committed by a ship engaged in commerce on any public navigable water of the United States, gives a remedy at common law in a state court by attachment *in rem* against the vessel specifically as debtor or offender, is in conflict with section 9 of the judiciary act of 1789, giving exclusive jurisdiction in admiralty and maritime causes to the admiralty courts; and this is so, even though the state law provide that the attachment of the ship be " in a pending suit."

2. ADMIRALTY JURISDICTION—EXCLUSIVE IN THE UNITED STATES COURTS—STATE CANNOT CONFER ON STATE COURTS.

   A vessel lien law of a state giving a lien upon any steam-boat or other vessel, raft, or river craft, for materials or supplies furnished to, or for service performed on, or for injury done by, such steam-boat or other vessel; or for wharfage, salvage, pilotage, or claim on contract of transportation due by such steam-boat or other vessel; and authorizing any claimant for such supplies, services, damages or injury, or dues, " in a pending suit," in a court of the state, to sue out an attachment specifically and particularly against " the vessel, her tackle, apparel, and furniture," as the debtor, offender, or tort-feasor, " whether the cause of action arose without or within the state, and whether the owner be resident or not," and before process " in the pending suit " is served, either actually or constructively,—such a law, and any proceeding under it, before service, either actual or constructive, upon the real owner of the vessel, violates the third division of section 711 of the Revised Statutes of the United States, giving cognizance to the United States district courts, exclusive of the state courts, of all civil causes of admiralty and maritime jurisdiction; and this is so, nothwithstanding that part of the same provision which " saves to suitors in all cases the right of a common-law remedy, where the common law is competent to give it."

3. COMMON-LAW REMEDIES—NOT ENFORCEABLE—VESSELS ENGAGED IN COMMERCE.

   Inasmuch as the rules of decision at common law enforce liens upon property in an order radically different from the order in which admiralty rules of decision enforce them, the common law is not competent to afford a remedy against a vessel engaged in commerce upon the public navigable waters, as between suitors having maritime claims against such vessel.

*J. A. Jones,* and *George Walker,* for plaintiff.

*R. M. Mayo,* for defendant.

HUGHES, D. J. This is an action of trespass on the case, brought to recover $10,000 damages for a tort, alleged to have been committed by a steam-boat.

The first section of the Virginia attachment law is as follows:

"When any suit is instituted for any debt, or for damages for breach of any contract, on affidavit, stating the amount and justice of the claim; that there is present cause of action therefor; that the defendant, or one of the defendants, is not a resident of this state; and that the affiant believes he has estate or debts due him within the county or corporation in which the suit is; or that he is sued with a defendant residing therein,—the plaintiff may forthwith sue out of the clerk's office an attachment against the estate of the non-resident for the amount so stated." Virginia Code 1873, *c.* 148, § 1.

The Virginia vessel lien law, as last amended on March 12, 1878, is as follows:

"If any person has any claim against the master or owner of any steam-boat or other vessel, raft, or river craft, or against any steam-boat or other vessel, raft, or river craft, found within the jurisdiction of this state, for materials or supplies furnished or provided, or for work done for, in, or upon the same, or for wharfage, salvage, or pilotage, or for any contract for transportation of, or any injury done to any person or property by such steam-boat or other vessel, raft, or river craft, or by any person having charge of her, or in her employment, such person shall have a lien upon such steam-boat or other vessel, raft, or river craft for such materials or supplies furnished, work done, or services rendered, wharfage, salvage, pilotage, and for such contract or injury as aforesaid, and may, in a pending suit, sue out of the clerk's office of the circuit court of the county, or of the corporation court, or of the circuit court of the corporation, in which such steam-boat or other vessel, raft, or river craft may be found, an attachment against such steam-boat or other vessel, raft, or river craft, with all her tackle, apparel, furniture, and appurtenances, or against the estate of such master or owners. Any attachment may be sued out under this section for a cause of action that may have arisen without the jurisdiction of this state, as well as within it, if the steam-boat or other vessel, raft, or river craft be within the jurisdiction of this state at the time the attachment is sued out or executed." Virginia Acts of '77–8, p. 217.

The history of this act is of some interest. It has always been, in some form, part of the state attachment law. It originated in a police provision for attaching vessels engaged in harboring, for the purpose of carrying away, runaway slaves. Code of 1860, *c.* 171, § 5, p. 646. By various amendments it was gradually enlarged and changed until, in 1866, (see Acts of 1865–6, *c.* 57, p. 171,) it gave a right to proceed in a state court for nearly every subject of admiralty jurisdiction, and continued the right previously given to proceed directly against the vessel as the debtor or offender; the statute itself reciting

that the vessel might be arrested and proceeded against "without the previous institution of any suit," or setting forth the name of the owner. It may be added (what was part of the public history of the times) that in 1866, and for some time, under the ruling of the then judge (Underwood) of the United States courts in this district, none but counsel who could take what was called the *iron-clad oath* were allowed to practice in the federal courts of Virginia; and the vessel lien law of the state was modified in 1866, by an act drawn by a very able lawyer who rested under this political ban, so as to omit the provisions as to runaway slaves, and to give a general jurisdiction over ships, equivalent to the admiralty jurisdiction. Neither in this amending act, nor in any of its predecessors, was the word "lien" employed; the old civil law *privilegium*—that is to say, the right of proceeding against and arresting the ship as herself the contractor or offender— being given in all the previous statutes. But in the final act of March 12, 1878, the words which authorized the proceeding against the vessel, without the previous institution of a suit *in personam* against the owner, were omitted in consequence of what was said *passim* by the district judge of this district in the case of *The Raleigh, Cannon, and Astoria,* 2 Hughes, 50–53, and of certain decisions of the supreme court of the United States hereafter mentioned, and a *lien* was given by name against vessels.

In this condition of the law the present suit was instituted in the circuit court of Westmoreland county, Virginia, on the thirtieth of September, 1880. The plaintiff had taken passage on the steamer Arrowsmith at the city of Washington, on the twenty-sixth of August, 1880, for Nomini, Virginia, and, while the vessel was still at the wharf at Washington, had been injured by the falling of a block of ice. The damages claimed are $10,000. There has been no service of process on the defendant, who is alleged in the declaration to be the owner of the steamer. On the same day on which the suit was begun, process of attachment was taken out against the steamer by name, the defendant being declared in the plaintiff's affidavit to be a non-resident. Process of attachment was immediately served, and the vessel arrested and held. She was thereupon bonded in the sum of $20,000. The attachment was not taken out under the general attachment law of Virginia, section 1, *c.* 148, of the Code, before quoted, which gives the right of attaching the "estate" of defendant, but was taken out under the vessel lien law, also before quoted.

The affidavit on which the attachment issues sets out in terms that the injury complained of was done to plaintiff while a passenger

by persons having charge of the said steamer Arrowsmith. The sheriff was not required by the process in the cause to levy the attachment upon any "estate" of the defendant to be found within the said county of Westmoreland, but was directed to attach "the said steamer Arrowsmith, with all her tackle, apparel, and furniture, for the said amount of $10,000." Some days after the vessel was attached and bonded, an order of publication was made against the defendant company, as a non-resident, and in due course thereafter publication was made. The defendant was never served with process. On the fourteenth day of April, 1881, the defendant appeared in the state court by counsel, and on its petition the cause was removed into this court.

The defendant then filed here a demurrer, and alleges, as ground of demurrer, that the court has not jurisdiction of the cause in a proceeding at common law; this being essentially an admiralty cause, exclusively cognizable in an admiralty court.

It is plain, as well from the affidavit on which the attachment was issued and the terms of the attachment as from the concessions of plaintiff's counsel, that this is a proceeding under what is called "The Vessel Lien Law," (quoted in the foregoing statement of facts,) and not under the foreign attachment law of Virginia. Since the decision of the United States supreme court in *Steam-boat Co.* v. *Chase,* 16 Wall. 522, common-law suits are maintainable against ships of commerce for causes of action arising at common law. A state has power to annex to suits for such causes of action auxiliary remedies, like foreign attachment, for the purpose of subjecting property of non-residents to the payment of debts due her own citizens. *Pennoyer* v. *Neff,* 95 U. S. 714. A statute, therefore, which gives a right to attach any property of a non-resident to satisfy a judgment when obtained is valid; and, under such a law, creating a remedy by attachment against all the property of a non-resident, in an action for a common-law tort already pending, a ship may, as the law stands at present, under the rulings of the supreme court of the United States, be attached as part of the estate of the owner defendant. But can a state give a special lien upon a ship for a cause of action peculiarly of admiralty cognizance, and provide a remedy by attachment for its enforcement specifically and directly against the particular vessel as a debtor or offender? That is the question on which this case turns.

The supreme court has decided, in the cases of *The Moses Taylor,* 4 Wall. 411; *The Hine* v. *Trevor,* Id. 565; and *The Belfast,* 7 Wall. 624, that states cannot give their courts the right to proceed against

vessels *in rem* for maritime causes of action. In consequence of those decisions, and one of the district court of this district, already cited, the legislature of Virginia, by the act of 1878, merely struck out from the vessel lien law, as it stands in section 5, in the 148th chapter of the Code of 1873, the language which gave the right to proceed against the vessel by name for admiralty causes of action; re-enacted it, gave a lien *in ipsissimis verbis* on the specific vessel, and provided for its enforcement by an attachment directed specifically and exclusively against the vessel as debtor or tort-feasor. It is true that the suit must now be brought against owners, real or fictitious, by name; but in no other respect are the proceedings altered. Plainly, all this was a mere evasion, contrived after the decisions referred to. The proceedings under the present law are, substantially, a libel *in rem* and *in personam* in admiralty.

The distinctive feature of an admiralty suit is that the *privilegium*, or right to pursue the particular ship, exists independently of possession, and exists only against the particular vessel on, or on account of, which the cause of action arose, which, in the eye of the admiralty law, is the real contracting debtor or offender, the real defendant.

It seems to me, therefore, that a statute which gives a lien on that specific vessel for that admiralty cause of action, and attempts to confer the right of enforcing it on a state court, comes within the reason of the cases above cited, even though the suit is, in form, against the owners nominally and the vessel really. The form cannot change the substance. In this case, for instance, the fact that the owners are named as defendants instead of the vessel, makes no real difference in the proceeding. They are not served personally with process. They can be brought into court only by an order of publication, precisely similar to that made in an admiralty cause, giving notice of seizure. The judgment, while in form against them personally, is yet enforced only by a sale of the vessel, or execution against the stipulators who stand for her. Can a suitor, then, be allowed to evade the decisions of the supreme court by merely altering the title of the case?

Where non-resident ship-owners are defendants, the right to proceed in the state courts against their vessels in admiralty causes of action, if it existed, would be a peculiar hardship. Unlike admiralty courts, which are always open for business, most of the state circuit courts are held only twice a year, and last but a short time. Being strangers, non-residents cannot often give the release bonds, with

large penalties, required by the state attachment laws. Their witnesses, being seamen, never remain long in one place, and hence their ships would be tied up idle for months, at a heavy expense, awaiting a distant term, with the probability of losing all their witnesses before the term begins. Continuances and new trials would make matters still worse. Besides all this, local juries are proverbially hostile to strangers, and it is natural that non-residents and mariners should be averse to running the hazard of their verdicts. Apprehensions of such delays and hazards are very prevalent among the masters and owners of shipping, and instances have come to my knowledge in which vessels have been attached in state courts for groundless claims, the suitors calculating that the vessels would pay the demand rather than be tied up for an indefinite period, awaiting the result of litigation in an unfamiliar tribunal.

There are still stronger reasons why admiralty causes should not be tried by common-law methods, and admiralty claims subjected to common-law rules of decision. I do not think the framers of the judiciary act of 1789, by the clause in the ninth section "saving to suitors, in all cases, the right of a common-law remedy, where the common law is competent to give it,"* intended to provide that admiralty causes might be tried in common-law courts in every case in which the subject of admiralty jurisdiction could be reached by common-law process, and the issues of fact and law arising in them could be tried under the common-law practice.

The constitution of the United States entitles the owners, navigators, employes, and commercial creditors of ships to have their rights determined by the rules of decision, and adjudicated by the expeditious methods obtaining in the admiralty courts; and the peculiar character, equities, and priorities of these claims are such that it is necessary, not only for the purposes of justice between man and man, but to the interests of commerce, that they should be so determined and adjudicated.

A ship is a thing that must be kept going, in order to subserve the objects for which she is built and employed. To arrest and hold her idle is to destroy her life. She is essentially a voyager. The interests of all connected with her voyages require that the priorities of the claimants and creditors should be the reverse of those which are recognized by common-law courts as applicable to things on land. The seaman is paid first. The material man, who supplies

*Now third clause of section 711 of the Revised Statutes.

or repairs the ship in equipping her for her voyage, is paid next; and, as between different material men, he who furnishes supplies or repairs at a later stage of the voyage, takes precedence of him who does so at an earlier stage. In general, the mortgagor, having a debt against the vessel, comes in behind other creditors holding maritime claims, and stands only in the shoes of the owner. Credit is given to the ship herself as the responsible debtor, and a wanderer and stranger; the owner being in general, and in the first instance, unknown to the creditor and ignored by the law. These are but a few of the rules of decision distinguishing the adjudications of the admiralty from those of the common-law courts.

Now it is plain that in cases in which the rights of suitors depend upon the admiralty law, the common law, whose rules of decision are in a great class of cases violently the reverse of those obtaining in the admiralty courts, is incompetent to afford the remedies contemplated by the ninth section of the law of 1789.

In a large number of cases an admiralty suit is in the nature of a creditors' bill in equity, in which the ship has to be sold and the claims of creditors marshalled and adjusted according to priorities observed and respected in all the admiralty courts of the world, in respect to ships. Can it be pretended that a suit at common law, commenced by attachment and order of publication against a non-resident owner, in a jurisdiction in which the ship is a stranger, and the rest of its creditors non-resident, is one in which the common-law practice and the common-law rules of decision are competent to the ends of complete justice? The proposition would seem to be little less than preposterous.

Suppose there be claims of seamen, material men, salvors, ship's husbands, and others existing against the vessel which has been arrested in the present suit, (and, for all we can know from this proceeding, there are such claims,) the claimants all having constitutional title to an adjudication of their rights in an admiralty proceeding, according to admiralty rules of decision; what would become of them in the present suit at common law, pending between no other possible parties than the plaintiff and the owner? The claims of the persons having primary rights in the vessel are not before the court, and cannot, by any legal possibility, be brought here in the present suit. It is not sufficient to answer that judgment in this case would not reach this particular vessel, which is bonded; for that is only to assert that by fortuitous circumstances this particular vessel has had the narrow chance to escape the injurious and unjust consequences

of this sort of suit. Nor would it be sufficient, if this vessel had not been bonded, but were still in custody of the court, to assert that the sale of her under execution at common law would convey to the purchaser only such title as a common-law court could give, and would leave her still subject, in the hands of her purchaser, to all outstanding maritime claims; for the vessel would have been in custody of the court awaiting the recurrence of rule-days and terms, and the delays of plenary proceedings, for nearly two years since its arrest, during which her seamen would, in all probability, have been scattered to the ends of the earth, and the material men of other ports, who had supplied her on short credit with things needful to keep her moving, would have been waiting in vain for payment. To have postponed the claims of those two classes of men for 18 months and more, would have been a denial of justice. Plainly, the common-law remedy, applying the rules of common-law decision to ships and their creditors, cannot but be prejudicial to the great interests of commerce, and to the rights of all persons connected with the navigation of ships.

The judicial history of the United States proves that the admiralty law and the admiralty practice are absolute necessities to the commerce of the country.

At one time, owing to a series of decisions rendered by the supreme court of the United States, all that very large portion of the Union not bordering upon or penetrated by tide-waters was deprived of this law and practice, and the deprivation was felt so keenly that very remarkable things occurred.

In a series of cases, among them *The Thomas Jefferson*, 10 Wheat. 428, and *The Orleans*, 11 Pet. 175, the supreme court held that the admiralty jurisdiction of the United States courts embraced only the tide-waters of the country, and, by so ruling, virtually excluded it from the regions watered by the great lakes of the north, and by the Mississippi river and its tributaries. The need of this jurisdiction was, in consequence, so severely felt by the commerce of those great regions that congress found it necessary to pass the act of February 26, 1845, "extending the jurisdiction of the United States district courts to certain cases upon the lakes and the navigable waters connecting the same." This law virtually erected the district courts of the United States, in districts bordering on the waters named, into *quasi* admiralty courts. It expressly provided that the practice and proceedings *in rem* obtaining in admiralty courts should be employed in the district courts in respect to vessels exceeding a certain ton-

nage, and that the maritime law and the rules of decision observed in admiralty courts should be applied to vessels navigating the lakes and waters connecting them.   This act of congress could, of course, have no operation in respect to vessels navigating interior waters other than those of the lakes and their connecting streams, and failed to reach the needs of the commerce of all the other waters of the Mississippi valley.   This defect was supplied by state legislation; all, or nearly all, of the states penetrated or bordered by those other waters passing laws authorizing their own courts to adopt and employ, to a greater or less extent, the practice of admiralty courts, and to deal with the vessels navigating them according to admiralty rules of decision.   While these things were going on the views of the supreme court of the United States, in respect to the extent of the admiralty jurisdiction, underwent a change; and in the case of *The Genesee Chief,* 12 How. 457, that court reversed its former ruling and held that *navigability,* and not the *ebb and flow of the tide,* was the test of the presence of that jurisdiction.   After this ruling it followed, as a logical consequence, that the court would also have to rule that the admiralty jurisdiction extended *proprio vigore* to the northern lakes, and to the rivers of the Mississippi valley; that it extended there by virtue of the constitution of the Union, and not by virtue of the congressional act of February 26, 1845, or of the statutes of the states relating to vessels, which have been mentioned.   Moreover, that this jurisdiction was exclusively in the courts of the United States, and that all state legislation conferring the jurisdiction upon state courts was unconstitutional.   All this, accordingly, that court has subsequently decided; as, for instance, in the cases of *The Magnolia,* 20 How. 296; *The Moses Taylor,* 4 Wall. 411; *The Hine* v. *Trevor,* Id. 555; *The Belfast,* 7 Wall. 624; *The Eagle,* 8 Wall. 15; and *Ins. Co.* v. *Dunham,* 11 Wall. 1.

This very cursory view of the course of legislation and adjudication on this subject shows that the admiralty law and practice—that is to say, the admiralty jurisprudence—is a necessity to the commerce of the country; that it cannot be dispensed with in regard to vessels employed upon the public navigable waters of the United States; that the courts of the Union and of the several states are bound to regard navigators of, and all persons interested in, ships, either in the character of owners, employes, or creditors, as entitled to the benefit of that jurisprudence; and that any state legislation designed directly, specifically, and particularly, to subject ships as such, and as debtors or offenders, to common-law procedure and common-law rules of decis-

ion, for maritime causes of action, is in necessary conflict with the constitutional provision and the congressional legislation giving to the United States courts exclusive cognizance of all civil causes of admiralty and maritime jurisdiction, and tends to work incalculable injustice to the classes interested in shipping.

Indeed, the necessity of resort to admiralty rules of decision in respect to things requiring constant outlays of labor and money in order to be rendered useful for the purposes for which they exist, has not limited itself to ships. It has recently extended itself to embrace railroads. The supreme court of the United States, in the recent cases of *Fosdick* v. *Schall*, 99 U. S. 235; *Hale* v. *Frost*, Id. 389; and other decisions, have found it necessary to relax the common-law principles of priority among creditors, and to apply to railroads principles assimilated to those of the admiralty law. In the former case it said:

"The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require; and when companies become pecuniarily embarrassed it frequently happens that debts for labor, supplies, equipment, and improvements are permitted to accumulate in order that bonded interest may be paid, and disastrous foreclosure postponed, if not altogether avoided.

"In this way the daily and monthly expenses are kept from those to whom in equity they belong, and used to pay the mortgage debt. * * * Every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts, before he has any claim upon the income. * * * When a receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipments provided, or lasting and valuable improvements made, out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of the funds, would have been paid in the ordinary course of business."

Thus the tendency of modern jurisprudence is very strongly towards a departure from the rigid and inelastic tenets and methods of the common law, in respect, at least, to the instruments and instrumentalities of trade and commerce; and I think the time is not far distant when the supreme court of the United States will find it necessary to hold that the attachment laws of states, allowing attachments *in rem* to be served on the general estates of defendants in pending suits, shall not be construed to embrace, in suits brought for causes of action clearly maritime, steam-boats, ships, and other vessels act-

ually engaged in the carrying trade on the public navigable waters of the United States covered by the admiralty jurisdiction.

It only remains for me to notice a few of the cases cited by plaintiffs' counsel in their brief, touching, apparently, this very point. In the case of the *Steam-boat Co.* v. *Chase*, 16 Wall. 522, there were two questions: (1) Whether a personal representative of an intestate (who had been run over and drowned by a large steam-boat) could bring suit in admiralty for the tort; the general rule being that claims for tort die with the claimant, and there being a state statute in Rhode Island, where the accident occurred, giving the right of action in a common-law proceeding to the representative of such an intestate. (2) If there were no right of action in admiralty, then the second question was: Whether, admiralty having no jurisdiction of the cause of action, a proceeding at common law in the state court, as this suit was, under the state statute, and an attachment of the steam-boat under the general attachment law of the state, was an interference with the exclusive jurisdiction of the admiralty courts in maritime causes of action. The supreme court held that this suit could be maintained in the state court, and that the attachment of the vessel was valid. That case, it is obvious, differs essentially from the one at bar. In that case both parties were residents of Rhode Island.

In the case of *Leon* v. *Galceran*, 11 Wall. 187, a state statute of Louisiana gave a right of attachment, called, in the local nomenclature, "a writ of sequestration," in certain cases, against the estate and property of a defendant, irrespectively of whether the plaintiff's claim was maritime or not. It was a statute similar in character to the general attachment law of Virginia, (chapter 148, § 1, of the Code,) which was quoted in the statement of facts prefixed to this opinion. The plaintiffs were seamen, who sued for wages earned on board of a schooner of the defendant employed on the Mississippi river in Louisiana, all being residents of the state, and probably of the city of New Orleans, where the suit was brought. The action was *in personam* against a defendant who also was a resident of Louisiana, and the schooner was attached, on mesne process, under the general attachment law which has been described. It was stated by plaintiffs' counsel in his brief in the supreme court of the United States, to which the case was carried from the state courts, that "the writ of sequestration [used in Louisiana] has no analogy whatever with the admiralty process, as understood and defined by writers on admiralty law;" and he cites article 269 *et seq.* of the Louisiana Code

of Practice, which is not before me.   The suit, therefore, was like an ordinary suit at common law between residents, in which, under a general attachment law, the property attached was a schooner of the defendant.   The case, apparently, is a strong one for the plaintiff in the present suit; but it differs essentially from it in the particulars about to be named.

We are considering here a law of Virginia which, in its original form, gave a *privilegium* in admiralty, and a proceeding *in rem* against a ship as such, for all maritime claims, although no suit *in personam* had been instituted, and irrespective of ownership.   This law having been pronounced, in the respects indicated, unconstitutional, was then changed, but changed only to the extent of providing that the proceeding *in rem*, though still taken out against the ship as debtor or tort-feasor, should be "in a pending suit."

I do not think so slight an amendment has rectified the inherent illegality of the statute.   I do not think a state statute, giving for a maritime cause of action a proceeding *in rem* specifically against a ship as the debtor or offender, is valid, in view of the third classification of causes in section 711 of the Revised Statutes of the United States, giving cognizance to the admiralty courts, exclusive of the state courts, "of all civil causes of maritime and admiralty jurisdiction."   I think the suit must be dismissed for want of jurisdiction.

As to the proposition of plaintiff's counsel that the defendant cannot raise the question of jurisdiction by demurrer, I have to say that however that might be in respect to other defects of jurisdiction, yet when the nature of the action is such that the court is incompetent to try it, then no formal plea to the jurisdiction is necessary; and whenever on any pleading the court is brought to the knowledge of the absence of its jurisdiction of the case, the court may *ex mero motu,* or on simple motion of either party, dismiss the proceeding. Moreover, it is elementary law that a demurrer brings the whole record before the court antecedent to the demurrer, and so the demurrer in this case is equivalent to a motion to dismiss.   The suit must be dismissed.