FARLEY *v.* ST. PAUL, M. & M. RY. Co. and others.*

*(Circuit Court, D. Minnesota. 1882.)*

EQUITY WILL NOT AID A FRAUDULENT TRANSACTION OR BREACH OF TRUST.

A court of equity will not aid parties in the consummation or perpetration of a fraud, nor give *any* assistance whereby *either* of the parties connected with a betrayal of a trust can derive any advantage therefrom; nor will it unravel a tangled web of fraud for the benefit of any one enmeshed therein, through whose agency the web was woven. Especially must this be the rule where one of its own officers, whose position is both advisory and fiduciary, seeks its assistance to compel alleged confederates to share with him the spoils acquired through his own concealments and deceits in the betrayal of his trusts.

*Griffith & Knight, Gilman & Clough,* and *Davis, O'Brien & Wilson,* for complainants.

*R. B. Galusha, Geo. B. Young,* and *Bigelow, Flandrau & Squires* for defendants.

TREAT, D. J. This case is before the court on a joint plea and the evidence pertaining thereto. Counsel on either side have given the largest aid to the court by oral arguments, elaborate briefs, and full citations of authorities; and therefore, however interesting an exhaustive review might be if time permitted, the task is unnecessary. It must suffice to state that the supposed conflict of authority, when the cases are analyzed, disappears, so far at least as the rules of equity decisive of the questions now to be determined are involved. It is a controlling maxim that a court of equity will not aid parties in the perpetration or consummation of a fraud, nor give any assistance whereby either of the parties connected with a betrayal of a trust can derive any advantage therefrom.

It is contended that this case does not fall within the general rule, because the fraudulent scheme ended with the purchase of the bonds, and the aid of the court is not invoked to enforce the same. It is clearly shown, however, that such purchase was merely the initiatory

*Reversed. See 7 Sup. Ct. Rep. 534.

step towards effecting the main design.   The theory of the bill, the plaintiff's own testimony, and all the facts and circumstances proved, demonstrate that plaintiff's scheme was to acquire the large railroad properties through the acquisition and use of the depreciated bonds. The plaintiff urges that he devised the plan, and that, without the assistance he alone could give, the plan would necessarily fail.   He goes even further in disclosing that it was only through concealment of his connection with the operations could success be realized.   He held an eminently fiduciary relation to all interested in the property committed to his management; and it was through information thus acquired and concealed from the beneficiaries, also from the state and United States courts, that the contemplated fraud could be effected.

It may be conceded that in private trusts, where constructive frauds have been consummated and the wronged parties do not complain, courts have refused to listen to volunteers, or, as between parties litigant, examine into the means whereby the one or the other has become charged with a new trust towards his associates.   This rule rests largely on the reason that the court is called upon, not to ascertain the sources whence the fund was derived, in the absence of beneficiaries complaining, but merely to decide whether a new trust was created which has been or is about to be violated. It may be that there is discernible in adjudged cases a distinction between acts *mala prohibita* and *mala in se,* through which funds have come into the hand of one confederate for the benefit of all,— acts which have no intrinsic turpitude further than is implied in the violation of a mere statutory prohibition.   The strongest case cited for plaintiff *(Brooks* v. *Martin,* 2 Wall. 70) contains that element, and seems to be shaded with the thought that the parties sought to be protected by the statute not only failed to complain, but most of them ratified expressly all that had been done.   That case was peculiar in many of its features, and, like the English cases cited in the opinion, is clearly distinguishable from the transactions now under review.   In those cases there was no act of moral turpitude, like the betrayal of trust for selfish greed, which called for investigation, but merely the relationship of the litigant parties, independent of prior dealings between them and others.

In *Brooks* v. *Martin* the court examined into the assignment obtained by Brooks from his partner, Martin, through actual fraud, and ruled that he could not shield himself from the consequences of that fraud by showing a prior violation of a prohibited act in which they

were participants, even if such a violation, consummated, furnished the trust fund assigned. To hold otherwise would have permitted a person to escape the consequences of one fraud by setting up another and distinct fraud in which the litigants had previously participated. To escape the result of a fraudulent assignment, Brooks urged on the court as a defense that said fraudulent assignment was connected with a joint fraud theretofore committed. Such a defense the court refused to consider.

There is another class of cases—the most pointed of all—the rigid enforcement of whose rules is essential to the pure administration of justice. Those rules not only forbid one charged with an official duty of a fiduciary nature from betraying his trust for private gain or any purpose whatever, and among other penalties subjects him to whatever loss may fall upon him through the dishonesty of his confederates. That statutory end is effected by a resolute refusal to give him any aid towards the enforcement against his confederates of their fraudulent scheme. Courts will not and ought not to be made the agencies whereby frauds are to be in any respect recognized or aided. They will not unravel a tangled web of fraud for the benefit of any one enmeshed therein through whose agency the web was woven. Especially must that be the rule where a trusted officer of a court, whose position is both advisory and fiduciary, seeks its assistance to compel alleged confederates to share with him the spoils acquired through his concealments and deceits, which he admits were deemed by his confederates and himself necessary to their success through his betrayal of his trusts.

The plaintiff conceived a scheme to wreck the vast interests which it was his duty to protect. He had acquired in his fiduciary capacity information through which the desired end could be reached. It was necessary for him to have confederates, that he should impart to them his secret information; that he should continue through the progress of the scheme to advise with and inform them of what, from time to time, became known to him; that his connection with them should be concealed from the courts, to whose orders he was subject, and which had a right to rely upon his fidelity. Through a betrayal of his trust under such circumstances, according to his version of the facts, these vast railroad properties have been secured, and a profit realized of possibly $15,000,000 or more. His pretense now is that through such betrayals of official and *quasi* judicial trusts, his alleged confederates have amassed properties, moneys, and values to a vast amount, with an understanding from the beginning that they were

to reward him for his betrayals by sharing with him one-sixth or some other portion of the spoils. They deny his averments, and he charges that they repudiate the fraudulent contract they made with him. As they do not divide the spoils, this suit is brought to compel them and the railroad defendant, as if by specific performance, to issue to him his proportionate share of its capital stock, and also grant him proportionate parts of profits and gains and also interests in undivided property yet remaining.

This is a strange demand to present to a court of equity. To what extent the alleged confederates are blameworthy or culpable, if at all, could be made to appear only after answer and full proofs. The court, however, must dispose of the case as now presented. A few days ago a demurrer interposed was overruled, on the ground, substantially, that the theory of the bill was to require of the court the enforcement against the railroad defendant not only a division of the alleged corrupt spoils, a part of which had passed to the possession of the co-defendants, but of the remaining assets, undivided; also a partition of property, etc., as just stated. Thus the powers of a court of equity were invoked to enforce the execution of a fraud on itself as a court as well as upon others. Surely no principle of equity, morals, or law can countenance such a demand, and no court worthy of its trust would lend its aid to further a scheme so abhorrent to all recognized rules of right and justice.

It is charged, however, and for the purposes of this case may be admitted, that Mr. Kennedy, agent of the Amsterdam committee, was advised by plaintiff during the progress of the scheme that he, the plaintiff, was secretly betraying his trust. If so, the gravity of plaintiff's offense was not lessened by thus adding a new confederate to his fraudulent plans, especially one whose relations were eminently fiduciary towards his principal, the Amsterdam committee, the court, and others interested. Plaintiff's cause of action is based upon inherent turpitude, and hence the fundamental maxim applies, "*Ex turpi causa*," etc.; therefore, another maxim has potential force, viz.: "*Potior est conditio defendentis.*" In plain English, courts of equity will not recognize as valid, or enforce, any agreement grounded in turpitude; nor will it undertake to unravel a tangled web of fraud for the purpose of enabling one of the fraudulent parties, after such judicial disentanglement, to consummate his fraudulent designs. The party complaining must come before the court with clean hands. In this case he has not, by the averments of his bill, nor by his sworn testimony, either clean hands, within the rules of equity, nor any cause

of action which can be upheld without a flagrant violation of the most positive and clearly-defined rules governing such cases.

The plea is sustained and the bill dismissed, with costs.

NELSON, D. J., concurred.