(*Municipal Court of Chicago. First District.*)

## Equitable Mutual Fire Insurance Company, a corporation,

### vs.

### A. L. McCrea.

(February, 1908.)

1. FIRE INSURANCE—FOREIGN INSURANCE CORPORATIONS—EFFECT OF SURPLUS LINE ACT OF 1903. The law of 1903, in relation to the placing of surplus line insurance with foreign insurance corporations not licensed to do business in the state, not merely permits the agent to act when the conditions provided by the law exist and procure a policy from the unauthorized company but sanctions the issuance of the policy in this state by which the transaction is completed. Thus, all claims arising out of such a policy are enforcible in this state not only by one but by all the parties to it.

2. PRINCIPAL AND AGENT—DUTY OF AGENT IN REGARD TO MONEY RECEIVED ON BEHALF OF PRINCIPAL WHICH HAS ARISEN OUT OF ILLEGAL TRANSACTIONS. An agent who has received money on behalf of his principal cannot defend against an action brought by the principal to recover such money by setting up that the transaction out of which it arose was illegal.

3. MAXIMS—IN PARI DELICTO—MEANING. The maxim *in pari delicto* does not mean that parties cannot recover who are both guilty but such as are guilty in equal degree.

Motion for new trial.  Case No. 752.  Heard before Judge Max Eberhardt.  The facts are stated in the opinion.

*Frederick A. Brown,* for plaintiff.

*Ossian Cameron,* for defendant.

EBERHARDT, J.:—

This case is pending in this court on a motion for a new trial.  The plaintiff obtained a verdict for $2,688.25, representing the amount of premiums collected by the defendant as the agent of the plaintiff, an insurance company organized and doing business under the laws of the Dominion of Canada and which amount the defendant had failed to pay over to said company.  The policies were issued by the plaintiff in the course of what is commonly known as the surplus line business, and apparently under and in compliance with an act passed by our general assembly on, etc., and entitled "An act providing for licenses to agents to procure fire policies in unauthorized corporations, providing for a bond to be given by such agents, and for a tax upon the receipts of premiums received for policies so issued within the state."

The motion, which, according to the last attitude taken by counsel for the defendant, is virtually a motion to set aside the verdict of the jury and dismiss the case—is urged upon the principal ground that notwithstanding the act in question, the plaintiff's claim is based upon, or grows out of, an illegal transaction or a contract made invalid and inhibited by the laws of the state of Illinois.  It is contended with much emphasis and vigor by the defense, that the plaintiff in issuing its policies and having a recognized agent, the defendant, in the state of Illinois, the business done comes within the provisions and the inhibition of the general insurance law of the state, and not having previously complied with these provisions, the plaintiff has no standing in this court and cannot recover.

It is further urged on behalf of the defense, that the business done and the policies issued by the plaintiff are not rendered lawful by the act of 1903, and do not take the plain-

tiff's case out of the operation of the previous act passed by our legislature regulating the conduct and providing for the admission into this state of so-called outside or foreign insurance companies for the purpose of doing a general insurance business. It is said that the Act of 1903 simply provides that citizens of this state may on certain conditions obtain a license to act as agents, and that they, after diligent effort by them made to obtain sufficient insurance from authorized companies, may procure surplus insurance from such companies as are by the general insurance law prohibited from doing business in this state; and that such agents, when they procure such surplus insurance for another, are the agents of the insured and can do no act whereby the insurance company itself can be exempted from the inhibition of the statute, inasmuch as they carry on the insurance business, with an established agency, in this state. Although the policies issued and the contracts made may, by the insured, be enforcible in Canada, they are, when made in contravention of our law, not enforcible by the insured in the courts of this state whose laws may have been violated and set at defiance.

The proposition that the general insurance law, before the act of 1903, renders invalid all contracts made and business done in this state by outside insurance companies not complying with the provisions of the law and the conditions the law imposes upon them, and the force and general application of the long line of cases cited by defendant in support of his contention, is conceded.

But let us see whether the construction applied by the defense to the act of 1903 is correct, and whether the proposition holds good that all contracts made by the plaintiff are unlawful and not enforcible in this state, notwithstanding the provisions of this act, permitting so-called surplus insurance by outside or unauthorized companies.

It is necessary for the purpose of this inquiry to quote the act in full.

"An act providing for licenses to agents to procure fire

policies in unauthorized corporations, providing for a bond
to be given by such agents, and for a tax upon the receipts
of premiums received for policies so issued within the state.
(Approved May 14, 1903.  In force July 1, 1903.  L. 1903,
p. 221; Legal News Ed. p. 182.)

"80h.  *License to agents to procure fire policies in unauthorized corporations—Account kept—Bond*).  Sec. 1.  *Be it enacted by the people of the state of Illinois* represented in the
general assembly.  That the superintendent of insurance, in
consideration of the yearly payment of two hundred dollars,
except in counties having less than one hundred thousand inhabitants, in which case the fee shall not exceed twenty-five
dollars, may issue to citizens of this state a license, revocable at any time, permitting the party named in such license
to act as agents to procure policies of fire insurance from
corporations, persons, partnerships and associations which
are not authorized to do business in this state.  Before any
insurance shall be procured under or by virtue of said license, there shall be executed by the licensed agent an affidavit, which shall be filed in the insurance department of this
state within thirty days after the procuring of such insurance.  Such affidavits shall set forth that the licensed agent
is after diligent effort, unable to procure the amount of insurance required to protect the property described in said
affidavit, from the insurance corporations duly authorized
and licensed to transact in this state.

"The agent procuring policies in such unauthorized corporations or with persons, partnerships and associations, shall
keep a separate account thereof, open at all times to the inspection of the insurance superintendent, showing first, the
amount of such insurance placed for any party; second, the
gross premiums charged thereon; third, in what corporation
or with what persons, partnerships or associations the insurance is placed; fourth, the date of the policy; fifth, the term
thereof, and sixth, the cities, towns and villages in which the
insured property is located.  Each party receiving such license shall, before transacting business thereunder, execute

8

and deliver to the superintendent a bond to the people of the state, in the penal sum of two thousand dollars, with such sureties as the superintendent shall approve, conditioned that the said agent will faithfully comply with all the requirements of this act and will pay to the insurance superintendent of the state of Illinois, for the use and benefit of said state, a sum equal to two (2) per cent upon the amount of the gross premiums received from policy holders upon all policies procured by him or issued by him during the preceding six months pursuant to this act, and in default of the payment to said insurance superintendent of any sum to which he is entitled under this act, he, the said insurance superintendent, may sue for the same in any court of record in this state." (Hurd's R. S., 1905, p. 1187.)

Under the act, the right of the agent who is unable after diligent effort to obtain sufficient insurance from companies authorized to do a general insurance business in the state, to procure so-called surplus insurance from an outside or unauthorized company, is unquestioned. It will at once become apparent that it could not have been the intention of the legislature to authorize a citizen of this state, who for the purposes of the law is called an agent, to procure that which is condemned as illegal and upon which the law has placed its ban. It is surplus insurance which may be procured. Can it be procured without the making of a contract binding upon the parties? Without the issuing of a policy by the insurer, the acceptance of such policy and the payment of the premium by the insured?

It does not require more than a mere reference to the most elementary principles of the law to show that this is impossible. But it is not only impossible in the law; it is also impossible in actual practice. If an agent desires to procure surplus insurance from an outside insurance company, that company would certainly not be willing to make that insurance except under a contract valid to all intents and purposes in the state where the law permits such insurance to be procured.

Would such insurance company issue its policies to be delivered by the agent to the insured, permit him to collect—the only thing practical in this instance—the premium from the insured upon the delivery of the policies, and thus in law making the agent its agent, without a right of action in this state to compel the agent to account for the premiums thus received?

It is not reasonable and consistent with logic to contend that the law permits only certain acts of the agent without at the same time sanctioning the entire transaction, in other words, a contract towards whose execution and procuring the acts of the agent are expressly authorized by the very terms of the law. Then, again, the act requires, among other things, the payment to the state of an amount equivalent to two per cent of the premiums collected by the agent. This is not in the nature of a forfeiture or confiscation of proceeds, in whole or in part, gotten from an illegal transaction or from a contract under the ban of the law; it is a tax levied by the state upon what it recognizes as property involving a property right. Taxes are defined to be burdens or charges imposed by the legislative power upon person or *property,* to raise money for public purposes. Cooley, Const. Lim. 587.

The state may, of course, levy a tax upon property without thereby sanctioning a previous illegal transaction, out of which such property may have been obtained; but the state will not and cannot, consistently with justice, expressly permit the doing of a thing, while at the same time declaring the transaction illegal, and, furthermore, with knowledge of all the facts, place a tax, as an instrument of its own support, upon the proceeds of such transaction. We repeat, the placing of a tax upon property recognizes the legal character of that property and a property right attaching to it.

This property right, however, inheres in the plaintiff.

We have no hesitancy in saying that the legislature never intended consequences, involved in the theory of the defense, so utterly at war with all principles of justice; that

it did not intend to legalize the acts of a mere agent result-
ing in a contract made in good faith, and then condemn such
contract, and order the doors of our courts closed to the
party who seeks to enforce it. The denial of all remedy for
the enforcement of an obligation or a right is unknown to
our law.

We cannot quote apter language applicable to the forego-
ing discussion than that employed by the court in the case of
*Kellogg v. Larkin*, 3 Pinney, 123 (Wis.):

"Before a court should determine a transaction which has
been entered into in good faith, stipulating for nothing that
is *malum in se,* * * * to be void as contravening the
policy of the state, it should be satisfied that the advantage
to accrue to the public for so holding is certain and substan-
tial, not theoretical or problematical."

And Judge Caldwell said in a more recent case:

"No court ought to refuse its aid to enforce such a con-
tract on doubtful and uncertain grounds. The burden is
on the defendant to show that its enforcement would be in
violation of the settled public policy of this state, or injuri-
ous to the morals of its people." *Swann v. Swann* (U. S. C.
C. E. D. Ark.) 12 Fed. 299.

The defendant says that an unauthorized insurance com-
pany cannot, under the guise of making insurance along the
surplus insurance line, transact a general insurance business
in the state. So say we. But as to whether the plaintiff
transacted a general insurance business, going outside the
surplus insurance business, is by no means apparent from
the evidence in this case, and the verdict of the jury, as
upon a question of fact, is conclusive upon this point.

We, moreover, call attention to the language of the act
which contemplates policies not only as *procured* but also
*issued* by an agent in the state. This shows that it sanctions
the making in this state of a contract of insurance along the
surplus line as valid. Issuing means executing an instru-
ment, as well as delivering it, as counsel for the plaintiff
aptly remarks, referring to the case of *Pease v. Ritchie*, 132
Illinois, 638–645.

*Issued* as used in reference to the issuance of a life insurance policy means that when the policy is made and delivered in pursuance with the laws of the state legalizing such policies, and is in full effect and operation, *it is to be regarded as issued.* *Spencer v. Myers,* 26 N. Y. S. 371,[1] 73 Hun, 274.

Hence when the act of 1903 speaks of policies procured or issued by the agent, it is, in view of the entire act, and a proper construction of it, equivalent to saying that such policies were made and delivered in pursuance with the laws of the state legalizing such policies, i. e. sanctioning such policies to be issued within the state, and that such policies are in full effect and operation within its entire jurisdiction.

We might well stop here by saying that the act of 1903 not merely permits an agent to act, but sanctions the completion of a transaction, in other words, a contract, towards the consummation of which the acts of the agent are directed; that it not only permits a surplus policy to be procured from an unauthorized company, i. e. one not permitted to do a general insurance business, but also to be *issued,* that is, *executed* in this state; and that, therefore, the contract is a legal contract, and all claims arising out of it, are enforcible in this state not only by one but by all parties to it.

Much time has been spent by counsel in this case in discussing the possible consequences which would be involved in the conclusion that the contracts under which the plaintiff claims were illegal and invalid in this state, notwithstanding the act of 1903. Counsel have cited a vast array of authorities for and against the proposition which holds that an agent cannot, after an alleged illegal contract has been fully executed, or an unlawful transaction been completed, refuse to account for and pay over money—the proceeds of such transaction—received by him for his principal.

Some of the authorities holding that the principal may recover money or property received by the agent on account of his principal, or money or property received by one standing in a fiduciary relation, though such money or property

---

[1] Affirmed 150 N. 269, 44 N. E. 974.—Ed.

may have been the proceeds of an illegal transaction, may be noticed in the following review:

"An agent who has received money from, or in behalf of his principal, cannot defeat an action brought by the principal to recover it, upon the ground that the contract under which the money was paid, or the transaction from which it was realized, or the purpose for which it was to be devoted, was illegal." Mechem on Agency, sec. 526, and authorities cited.

If money had been actually paid to an agent, for the use of his principal, the legality of the transaction, of which it is the fruit, does not affect the right of the principal to recover it out of the agent's hands. For though the law would not have assisted the principal by enforcing the recovery of it from the party by whom it was paid, because it is the policy of the law not to aid the completion of an illegal contract for another's use, this can confer no right upon the agent to retain it.

This doctrine was recognized by the court of common pleas in a case where a broker having effected an insurance upon a ship engaged in a trade to the East Indies, contrary to the 7 Geo. I, st. 1, c. 21. s. 2, and having received the loss from the underwriters refused to pay it over to his employer, alleging the illegality of the transaction as a defense to the action for money had and received to his use. The plaintiff, however, had a verdict; and the court, upon a motion for a new trial, thought the verdict right. And in a subsequent case, when the defendants had received money for the plaintiff, as the price of counterfeit coin, which they had been employed to carry and procure payment for, from the parties who purchased it, it was held that the illegality of the transaction furnished no defense to them in an action for money had and received.

And, in both these cases, the court considered the original transaction as forming no part of that implied contract arising from the receipt of the money which formed the ground of the action. Dunlap's Paley on Agency, pp. 61, 62.

In the case of *Brooks v. Martin,* 2 Wall. 70, the supreme court of the United States held, that after a partnership contract confessedly against public policy has been carried out, and money contributed by one of the partners has passed into other forms, the results of the contemplated operation completed, a partner, in whose hands the profits are, cannot refuse to account for and divide them on the ground of the illegal character of the original contract; especially where the facts appearing are such as to charge such partner with a fiduciary relation, and the law governing such relations applies.

The money and other property for which suit was brought were clearly the proceeds of an illegal transaction. Justice Miller, speaking for the court, said: "We think that, in point of fact, the allegation of the answer—that the traffic in which this firm engaged was the buying up of the soldiers' *claims,* before any scrip or land warrants were issued, and not the purchase and sale of bounty land warrants and scrips —is true. We have as little doubt that the traffic was illegal."

"It is," the court further says, "to have an account of these funds, and a division of these proceeds, that this bill is filed. Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldier? It is difficult to perceive, how the statute, enacted for the benefit of the soldier, is to be rendered any more effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner; or what rule of public morals will be weakened by compelling him to do so.  *  *  *  The transactions which were illegal have become accomplished facts and cannot be affected by any action of the court in this case."

The court goes on to quote the language of Lord Chancellor Cottenham in deciding a similar case (*Sharp v. Taylor,* 2 Phillips, Chancery, 801) which is as follows: "The

answer to the objection (the illegality of the transaction out
of which the present suit arose) appears to me to be this,—
that the plaintiff does not ask to enforce any agreement ad-
verse to the provisions of the act of parliament. He is not
seeking compensation and payment for an illegal voyage.
That matter was disposed of, when Taylor (the defendant)
received the money; and plaintiff is now only seeking pay-
ment for his share of the realized profits.  *  *  *  As be-
tween these two, can this supposed evasion of the law be set
up as a defense by one against the otherwise clear title of
the other.  *  *  *  The answer to this, as to the former
case, will be that the transaction alleged to be illegal is com-
pleted and closed, and will not in any manner be affected by
what the court is asked to do between the parties.  *  *  *
The difference between enforcing illegal contracts, and assert-
ing title to money which has arisen from them, is distinctly
taken in *Tenant v. Elliott*,[1] and *Farmer v. Russell* [2] (already
quoted) and recognized and approved by Sir William Grant
in *Thomson v. Thomson*.[3]

"These cases," Justice Miller further says, "were all re-
viewed in the opinion of this court in the case of *McBlair v.
Gibbs* (17 Howard, 232) and the language here quoted from
the principal case is there referred to with approbation. We
are quite satisfied that the doctrine thus announced is
sound."

This doctrine was recognized and applied in the following
cases: *Planters' Bank v. Union Bank,* 16 Wall. 483, to a
case of money received from the sale of "Confederate
Bonds;" *Armstrong v. American Bank,* 133 U. S. 433, and
*Lehman v. Strassberg,* 2 Woods, 563, Fed. Cas. No. 8216
both holding a person who loans money to another to pay
losses sustained in illegal transaction may recover same;
*Western Union Tel. Co. v. Union Pacific Co.,* 1 McCrary, 563,
3 Fed. 417, holding property acquired under void contract

---

[1] Bosanquet & Puller, 3.—Ed.

[2] Id. 29—Ed.

[3] 7 Vesey, 473.—Ed.

must be distributed according to equity; *Wann v. Kelly,* 2 McCrary, 630, 5 Fed. 584, where joint owner was held liable to account to his associates for money paid under an illegal but completed contract, and in *Cook v. Sherman,* 4 McCrary, 26, 20 Fed. 167, where the precise question as presented in the case of *Brooks v. Martin* was presented.

In the case of *Penn Mutual Life Insurance Co. v. Bradley et al.,* 21 N. Y. S. 876,[1] in which the facts were almost identical with the present case, the court, after stating the action was brought to recover for money had and received by the defendants for the plaintiff while they were acting as plaintiff's agent in procuring life insurance and collecting premiums, said: "* * * the appellant contends that the plaintiff was not entitled to recover the premiums for the reason that the company was not authorized to do an insurance business in the state of New York." And the court, deciding the case, said: "* * * the defendants having received the money as plaintiff's agent, they are not at liberty, when called upon for payment, to set up such a defense."

In the case of *Snell, Taylor & Co. v. Pells,* 113 Ill. 150, our own supreme court said: "Whatever may be thought as to the legality of such a contract or subscription, its illegality, if any, rests solely upon the suggestion that the same is merely against public policy, and not upon the ground that there is anything *immoral* or *criminal* in such a contract. In such case, an agent who has received money for his principal cannot by law set up such supposed illegality as a reason why he should not pay over the same to his principal. The law in such a case does not permit the agent to make such a defense. He is estopped by the relation of agency, and the receipt of the money."

We admit that the authorities do not all agree. There seems to be a tendency in some jurisdictions to deny the principal the right to recover in a case based upon a transaction involving criminality or moral turpitude, or in a case where both the agent and the principal have directly partici-

[1] Aff'd 142 N. Y. 660.—Ed.

pated in the unlawful transaction. *Todd v. Rafferty,* 30 N.
J. Eq. 254; *Farley v. St. Paul, etc., Ry. Co.,* 4 McCrary, 141,
142, 14 Fed. 115; *Jackson v. McLean,* 36 Fed. 213; *Morrison
v. Bennett,* 20 Mont. 560, 52 Pac, 553; *Booth v. Hodgson,* 6
T. R. 405; *Kirk v. Morron,* 6 Heisk. (Tenn.) 445; *Lemon v.
Grosskopf,* .22 Wis. 447; *Bishop v. American Preservers Co.,*
157 Ill. 284; *Gregory v. Wilson,* 36 N. J. L. 315; *King v.
Winants,* 71 N. C. 469; *Columbia Carriage Co. v. Hatch,* 19
Texas Civ. App. 120, 47 S. W. 288; *Wiggins v. Bisso,* 92.
Tex. 219, 47 S. W. 637; *Mexican Banking Co. v. Lichten-
stein,* 10 Utah, 343; *Watson v. Murray,* 23 N. J. Eq. 257;
*Thorne v. Travelers' Ins. Co.,* 80 Pa. St. 15; *McMullen v.
Hoffman,* 174 U. S. 639.

But it is difficult, as far as the cases are concerned in
which the maxim *in pari delicto* is applied, to conceive it
more consistent with justice to require an innocent agent re-
ceiving for his principal the proceeds of an illegal transac-
tion fully completed and a thing of the past, to disgorge and
pay over such proceeds to his principal, .than to require a.
man to do the same thing whose acts are as odious as, or even
more so, than the principal's. This distinction can be only
accounted for by placing too much stress upon and giving
unlimited scope to a mere abstract legal maxim, such as that
*in pari delicto potior est conditio defendentis.*

The danger resulting from a too wide application of ab-
stract legal maxims, and the injustice or even absurdities it
sometimes leads to, is forcibly pointed out by Justice Chris-
tiancy, who was one of the ablest judges that ever sat on the
bench of any supreme court. In the case of *Quirk v.
Thomas,* 6 Mich. 76, 110, he says: ''One qualification of the
rule is that the rule itself shall not be made an engine of
wrong and injustice in the hands of the wrongdoer.   *   *   *
The rule in question is the same which. declares that a party
'must come into court with clean hands'—'that no polluted
hand shall touch the pure fountain of justice'—that the
court will not aid a party seeking the reward of his ini-
quity.   *   *   *

''Not only is it incompetent to set up such a defense

against an innocent party, but the law will discriminate as to the degrees of guilt, as between the immediate parties; and it is well settled, both at law and equity, that to enable a party to a transaction merely illegal as against public policy, to show his own fraud in his own defense, the plaintiff must not only be *in delicto* but *in pari delicto*. And it is in this class of cases that the rule *in pari delicto* especially applies; and though the plaintiff may, to some extent, have participated in the illegal transaction, yet, if not *equally guilty* with the defendant, (or at least if there be strong mitigating circumstances in his favor) the latter will not be allowed to avail himself of the defense."

In addition to this, we may point out more especially that the maxim *in pari delicto* does not mean that parties cannot recover, who are both guilty, but such as are guilty in *equal degree*.

It may be said, in view of what appears from the evidence in this case, that the defendant, a resident and citizen of Illinois, was in all respects better advised as to the laws of his own state than the plaintiff; having repeatedly assured plaintiff that by writing insurance on property of citizens located in this state, it was not violating any law, he lulled the plaintiff into a state of security; by his endorsement on every policy issued, that it was issued in compliance with the act of 1903, and assuring the plaintiff of that fact, he obtained from the plaintiff in the shape of its policies the means of collecting large amounts of money as premiums paid by the insured to him, the agent of the plaintiff,—that in view of all these facts, his degree of guilt, if any, is greater than the plaintiff's, and he should, on that account, be estopped from pleading the illegality of these entire transactions as a defense in this case.

There is, however, still another view to be taken in the consideration of this question, and this is with special reference to the act of 1903. Admitting, for the sake of argument, that the several contracts of insurance were illegal, as being in contravention of the general insurance law, yet the act cited expressly permits and sanctions the act of the agent

in procuring the several contracts, and hence the agent in so doing is not placed even *in delicto,* much less *in pari delicto.*

In this event the law, as settled by numerous decisions, requires him to account for and pay over the money received by him on account of his principal. Especially in view of the general law of this state, regulating insurance companies, which does not expressly prohibit the bringing of a suit, either in law or equity, on any claim, legal or equitable, whether arising out of contract or tort, in case the statute for the admission of outside or foreign corporations be not complied with.

Is there, in view of what has been said, any reason in the claim, that we must adopt a construction of the act which would allow an agent, and make it perfectly lawful for him, to procure so-called surplus insurance from an unauthorized insurance company; allow him to receive its policies, and, upon delivery of such policies to the insured, collect the premiums; then permit him simply to put the money into his pockets and refuse to pay it over to his principal? And all this on the plea that what he, the agent, had done was perfectly right and sanctioned by the law, while what the insurer and the insured had done was absolutely void, and odious in the eye of the law. We do not think reason and justice would require us to adopt such a construction.

In view of what we hold to be the law and for the reason that all disputed questions of fact have been properly settled by the verdict of the jury, the court must deny the motion for a new trial and orders that judgment be entered on the verdict.

Judgment on verdict.