CHARLES H. GOULD AND THOMAS P. KENNARD, AP-
PELLEES, V. NERIAH B. KENDALL AND CHARLES
D. SMITH, APPELLANTS.

1. **Contract against public policy.** No court of law or equity
will lend its assistance in any way towards carrying out an il-
legal contract; therefore such contract cannot be enforced by
one party against the other, either directly, by asking the court
to carry it into effect, or indirectly, by claiming damages or
compensation for a breach of it. *Sykes v. Beadon,* 11 Ch. Div.,
170.

2. ——.. A contract by which G. & K., who were the holders of
a license to trade with the Indians at Fort Peck Indian Agency,
agreed to pay to K. & S. the one-half of the net profits of such
trade, for the consideration of the said K. & S. purchasing all
goods and supplies necessary and proper for said trade at their
own account and credit, and immediately resell and invoice such
goods to G. & K., at said agency, at cost price, cost of transporta-
tion and insurance added, and one of the said K. & S. take
entire charge, management, and control of said business, devot-
ing his entire time and attention thereto, and residing at Fort
Peck, is illegal, for the reason that it contemplates the violation
of the statute as well as the public policy of the government of
the United States.

APPEAL by defendants from a decree of the district
court of Lancaster county, POUND, J, presiding.

THE action was brought to settle an alleged partnership
claimed to exist under the contract alluded to in the opin-
ion.   This contract was as follows:

"Memoranda of agreement, executed in duplicate, made
and entered into this fifth day of June, A.D. 1879, by and
between Charles H. Gould and Thomas P. Kennard, of
Lincoln, Nebraska, parties of the first part, and Kendall
& Smith, a firm composed of N. B. Kendall and Charles
D. Smith, doing business at Lincoln, Nebraska, party of
the second part, witnesseth, that

" WHEREAS, The said Charles H. Gould and Thomas P. Kennard have been appointed by the general government as Indian traders at Fort Peck Indian Agency in Montana territory, and have organized the firm of Gould & Kennard to carry on the business of traders at said agency; and, WHEREAS, the said Kendall & Smith are desirous of obtaining an interest in the business and profits of said agency trade; it is therefore agreed' by and between the said Gould & Kennard, of the first part, and the said Kendall & Smith, of the second part, that the said Gould & Kennard shall pay to the said Kendall & Smith one-third part of the net profits of the business at said agency for the entire time the said Gould & Kennard shall hold a license from the general government, unless this contract should sooner be revoked and annulled by the unanimous agreement of the individual parties thereto, said payment of the one-third part of the net profits to be made as hereinafter stated. In consideration whereof the said Kendall & Smith do agree as follows, to-wit:    That they will, so soon as directed thereto by the said Gould & Kennard, or as soon thereafter as may be, purchase at their own expense, in their own name or names, and on their own account and credit, all the stock of goods, of quality, quantity, and variety sufficient to properly stock the agency store of the said Gould & Kennard at Fort Peck Indian Agency, and to make, such other like purchases from time to time as may be necessary to properly keep up said stock. All of which said goods so purchased from time to time as required shall when so purchased, be immediately consigned, resold, and invoiced to the said Gould & Kennard, at the said agency, at the same price at which they were purchased, the necessary expense of transportation, insurance, and traveling expense incident to said purchase only to be added. The said Charles D. Smith will take entire management and control of said business, and of the buying and selling, devoting his entire time and attention thereto, and residing

at Fort Peck; he shall keep the books of accounts, or cause them to be properly kept, and said books shall always be subject to inspection by the parties hereto. He shall employ the necessary clerks for the proper conduct of said business, except that the said Gould & Kennard reserve the right to appoint two of said clerks, subject to approval by the said Smith; he shall pay all the expense of whatsoever nature of said business out of the proceeds of said business, and shall, out of said stock of goods, or the proceeds thereof, pay the said Kendall & Smith for their purchases, on account of the said Gould & Kennard, and shall render a semi-annual exhibit or statement of said business, showing the amount of stock on hand, the liabilities on account of stock, and the net cash profits as near as may be, and the said Kendall & Smith shall then have a right to demand and receive from said Gould & Kennard seventy-five per cent of one-third part of the said net cash profits, the remaining twenty-five per cent of said net cash profits to be paid the said Kendall & Smith at the expiration of the license of said Gould & Kennard, or on the annulling and revocation of this agreement as hereinbefore provided. It is further agreed and understood between the parties hereto, that the said Gould & Kennard shall be privileged to withdraw seventy-five per cent of two-thirds of the net cash profits at the same time the said Kendall & Smith are paid as above provided." (Signed by the parties.)

Modified as follows:

" This contract is hereby amended and modified to read as follows, to-wit: And the said Gould & Kennard shall pay to the said Kendall & Smith, at the times, and in the manner hereinbefore stated, an equal one-half part of the net profits of the business, and everything herein inconsistent with this modification is this day abrogated." (Signed by the parties.)

*Mason & Whedon,* for appellants, cited :    *East Jersey v. Wright,* 5 Stew. Eq., 253.    *Railway v. Hoboken,* 1 Vroom, 75.    *Caldwell v. Fulton,* .31 Penn. State, 477. *Holt v. Green,* 73 Id., 198.    *Coppel v. Hall,* 7 Wall., 558.    *Watson v. Murray,* 23 N. J. Eq., 257.    *Todd v. Rafferty,* 30, Id., 254.    *Snell v. Dwight,* 120 Mass., 9. *Thompson v. Thompson,* 7 Ves., 470.    *McBlair v. Gibbes,* 17 How., 237.

*J. R. Webster,* for appellees, cited :    *Brooks v. Martin* 2 Wall., 70.    *McBlair  Gibbs,* 17 How., 232.    *Armstrong v. Toler,* 11 Wheaton, 258.    *Planter's B'k v. Union B'k,* 16 Wall., 483.    *Kinsman v. Parkhurst,* 18 How., 289.    *Tennant v. Elliot,* 1 B. & P., 3.    *Farmer v. Russell,* 1 B. & P., 296.    *Thompson v. Thompson,* 7 Ves., 470

COBB, CH. J.

I think this case might be designated a suit in equity for an accounting and damages, or it might be called an action o account at common law    In either view the action is brought directly on the written contract set out and described in the petition, and for its breach.    I do not think that the contract can be held to have created a partnership between the parties, even as between themselves.    The object in construing a contract is to ascertain the intent of the parties when they executed it.    The law will, when necessary, give a name to the relationship established between contracting parties, according to the intent of the parties, as expressed in the words of the contract, and, in cases of doubtful meaning, the relations of the several parties towards each other and towards the subject matter of the contract, as well as their contemporaneous acts and dealings, will all be considered.

Now let us look at the language of this contract.    The words partner or partnership are neither used in it through-

out, but seem to have been studiously avoided. The plaintiffs having procured a valuable license to trade with the Indians, and purposing to make that available to the benefit of all parties, it would seem that if a partnership was contemplated the defendants would have been required to contribute something to a common fund. But nothing of the kind is required of them. True, they agree to purchase a stock of goods and to replenish it from time to time in their own name or names, and on their own account and credit—and what shall they do with such goods, put them into the partnership or common stock of all the parties? By no means—but said goods "shall when so purchased be immediately consigned, resold, and invoiced to the said Gould & Kennard, at said agency," etc. "The said Charles D. Smith will take entire management and control of said business, and of buying and selling, devoting his entire time and attention thereto, and residing at Fort Peck," etc. Now then, what do the plaintiffs agree to do on their part? Nothing. True, at the commencement of the agreement, they agree to pay to the defendants one-third part of the net profits of the business at said agency for the entire time the said Gould & Kennard shall hold the license from the general government, etc. But that is qualified, by what follows, to mean that the defendants were to keep one-third part of what they could make clear, using their own money, credit, and labor. This, by a subsequent amendment to the contract, was changed to the one-half.

We have seen above what the defendants agreed to do. Now then, what did they do, or fail to do? The petition informs us that "about the 8th day of August, 1879, the said defendants did stock said tradership store, to the amount and value of which stock furnished these plaintiffs are unable to state." From this point forward, the petition charges a series of violations of the contract, and alleges nothing thereafter done in pursuance of its terms;

all that is done is charged to be to the damage of the plaintiffs. Nothing is alleged to have been done for their benefit. It is alleged that Mr. Gould, one of the "plaintiffs, personally attended at the place of business of said tradership or store, and desired and requested to give his time and personal attention to the proper and lawful conduct of said business; but said Smith then usurped to himself and the other defendant the sole and entire management of said business, and wholly excluded said Gould and both of these plaintiffs from any part in the conduct of said premises." It was evidently the intention of the parties in drawing up the contract that while the defendants, or Charles D. Smith, should be personally present in the Indian country, yet that he should, while there, in a kind of vicarious sense sometimes be Gould & Kennard. That he should buy goods from wholesale dealers as Kendall & Smith, as Kendall & Smith sell them to Gould & Kennard; and as Gould & Kennard retail them out to the Indians. This is what he agreed to do, but it is that which according to the petition he refused to do, and did not do.

If the plaintiffs had placed money or goods in the hands of Kendall & Smith, or of Charles D. Smith, I agree that he could not hold on to it and at the same time claim in a court of equity that he used it for his own use and benefit and not for theirs. They had, in a manner, placed their license in his hands, but in law that gave him no right; and whatever advantage he may in fact have derived from such license cannot be considered, or an account taken of, in a court either of law or equity. The defendants then not having received either money or other valuable thing from the plaintiffs of which the law will take account, they are accountable to them, if at all, solely by virtue of the contract.

Many years ago the government of the United States adopted the policy of prohibiting trade and intercourse

between the people and the Indian tribes, allowing only such persons to reside among and trade with the Indians as should be licensed as traders by the proper officers of the government, together with such clerks and employes as should be approved and specially designated by the officer granting such license. See §§ 2129, 2130, and 2133, p. 372, Rev. Stat. U. S. These licenses, on account of the special privileges thereby granted, have usually been valued quite highly by traders and capitalists on the frontier. The plaintiffs had obtained such a license, and it must be apparent to the reader of the contract entered into between them and the defendants that the sole object of such contract was to put the said defendants in their places as Indian traders, and make the use of their franchise alone balance the combined labor and capital of the defendants in the usufruct of the Indian trade; and the object of the defendants, on their part, was to make their capital and labor, through the borrowed and talismanic power of the plaintiffs' license, yield them a share of the same lucrative trade, without submitting themselves to the approval of the officers of the Indian Bureau. I see no moral turpitude in all of this on the part of either the plaintiffs or defendants, but it involves, on the part of both parties, an attempt to violate the statute as well as the policy of the government by introducing into the Indian country and trade, under color of the plaintiffs' license, the defendants, whose character, as persons fit to be in the Indian country, had not been approved by the proper officers of the government. It need scarcely be said that a contract for such purpose will not be enforced by a court either of law or equity.

The case of *Brooks v. Martin*, 2 Wall., 70, cited by counsel on either side, did not depend, nor was it founded mainly on contract. The equity which carried that case depended on the fact that Martin had placed a large sum of money into the hands of a partnership consisting of

himself, Brooks, and one Field, formed for the purpose of dealing in soldiers' land warrants, "that may have been or may be issued under the law of Congress," etc. Martin, who was a banker, gave no personal attention to this business, which was carried on chiefly by Brooks. The purchase of, or dealing in, soldiers' bounty land warrants already issued was lawful, and the assignment of such warrants binding on the soldier; but the assignment of the title or claim to such warrants made before their issue was declared by statute to be "null and void to all intents and purposes whatsoever." No doubt, as claimed by Brooks in his answer, the purchases made by the partnership consisted mainly of the claims of soldiers before the issue of the warrants. These claims, although their assignment was void in law, were never disputed by the assignors, and were made available to the partnership the same as though the warrants had been regularly assigned after their issue. These claims were converted into lands, mortgages, and money, which, though under the direct control of Brooks and Field, yet were held and acknowledged as the property of the partnership of which Martin was a member, and the capital of which he alone had supplied. Thus matters stood when Brooks, by means of false and fraudulent representations and means, induced Martin to sell to him his interest in the partnership property very far below its value. The main object of the suit was to set aside this sale. An accounting to Martin for his share of the partnership property would follow as a matter of course. The bill need not, nor did it in fact, set up or count upon the contract of partnership or its terms. If it had, such contract did not necessarily involve the violation of the statute. A large and lucrative business could have been done at that time and place by the use of the amount of capital furnished the said partnership by Martin, in the purchase of land warrants already issued. But the court decided the case in favor of Martin, chiefly on the ground

of partnership, and that the property of the partnership was the product of the money furnished by Martin. So far as the case follows *Sharp v. Taylor*, 2 Phillips Ch., 801, the leading case cited by the court, that which it does decide can scarcely be considered as authority, the case of *Sharp v. Taylor* having been severely criticised if not overruled by the same court or its successor in the case of *Sykes v. Beadon*, 11 Ch. Div., 170. I quote a part of the syllabus of the latter case: "No court of law or equity will lend its assistance in any way towards carrying out an illegal contract; therefore such a contract cannot be enforced by one party to it against the other, either directly by asking the court to carry it into effect, or indirectly by claiming damages or compensation for a breach of it, though there may be some cases in which a party to such a contract may recover from a third person money paid over to that person in pursuance of the contract."

Ch. J. Marshall, in the case of *Armstrong v. Toler*, 11 Wheat, 268, stated the law with great clearness and perspicuity in the following language: "Questions upon illegal contracts have arisen very often, both in England and in this country, and no principle is better settled than that no action can be maintained on a contract, the consideration of which is either wicked in itself or prohibited by law."

We have seen above, to my own satisfaction at least that the plaintiffs and defendants in the case at bar cannot be considered as partners for the want of an intention on their part to establish that relationship, as expressed by the language of the contract, as well as the lack of mutuality of its terms. It cannot be claimed that the plaintiffs are entitled to this remedy for the purpose of following their money or property in the hands of the defendants and claiming a share of its product or earnings, for they have placed neither money, property, or services there. They have given to the defendants, so far as they could, the

ægis of their license, for which the defendants promised, them a certain share of the net profits of their business; but as we have seen, the consideration being illegal, that promise cannot be enforced.

It may be claimed that the defendants having done business in the name of the plaintiffs, are estopped to deny the interest of the plaintiffs in that business. That would probably be so could the plaintiff's case ever reach the point at which the defendants are required to develop their defense, but the difficulty is in the inherent weakness of the plaintiff's case. They cannot reach the enemies' works except through the contract, which, by reason of its illegality, is "no thoroughfare" for them. The judgment of the district court is reversed, and the cause dismissed.

REVERSED AND DISMISSED.

THE other judges concur.