GEORGE C. HOBBIE, APPELLEE, v. JOSEPH G. ZAEPFFEL ET AL., APPELLANTS.

1. **Contract against Public Policy.** No court of law or equity will lend its assistance in any way towards carrying out an illegal contract; therefore such contract cannot be enforced by one party against the other, either directly, by asking the court to carry it into effect, or indirectly, by claiming damages or compensation for a breach of it. *Gould et al. v. Kendall et al.*, 15 Neb., 549.

2. **The Findings and Judgments** must be *secundum allegata* as well as *secundum probata*. *The Hoppet*, 7 Cranch, 388.

APPEAL from Washington county. Heard below before WAKELEY, J.

*W. J. Connell,* for appellants.

*Congdon, Clarkson & Hunt,* for appellee.

COBB, CH. J.

The first proposition which presents itself for consideration in this case is: Was the consideration for the note upon which this action was brought a legal and valid one as between the makers and the payee?

The consideration for the giving of the said note, with other notes, was expressed in the following written contract, which was introduced in evidence at the trial and preserved in the bill of exceptions, to-wit:

"For and in consideration of four thousand dollars in notes, secured by mortgages, given by J. Zaepffel, I hereby sell and assign to him an undivided half of my interest in the New Red Cloud tradership.

"It is understood between us that said notes are to be sold by C. L. Bristol, for a sum not less than two thousand dollars, for means with which to carry on the Indian trad-

ing business at New Red Cloud; and that said notes are
an joint debt, and are to be paid out of the profits of the
business as soon as the stock of goods is paid for; and
that all the profits of such business are to be applied to the
liquidation of said notes as fast as received, except for
necessary individual expenses of ourselves.

"It is further agreed and understood that C. L. Bristol
is to give his time and attention, without charge or salary,
to the business, and also, that with consent of J. W. Pad-
dock, if there is sufficient business, that J. Zaepffel shall
be employed at a reasonable salary, to be paid out of the
profits of the business; that after the stock of goods is
paid for, and the notes aforesaid are paid, the profits shall
continue to be divided equally between us (C. L. Bristol
giving his services without charge) during the term of the
present license, and also during the term of any subsequent
license.

"It is further agreed that if at any time J. Zaepffel
may think his interests require it he shall have the right
to take personal control of the business until such time as
the notes aforesaid are paid.

"Witness our hands this 12th day of April, 1878.
"[SIGNED.]                         C. L. BRISTOL,
                                   "J. G. ZAEPFFEL."

If at the date of this contract the said C. L. Bristol
was the holder of a license from the government of the
United States to trade with the Indians at the New Red
Cloud agency, as was evidently claimed by him, or else-
where in the Indian country, then the consideration which
he was to give and Zaepffel was to receive for the said note
was a one-half interest in the franchise rights and privi-
leges contemplated by such license.

Section 2129 of the Revised Statutes of the United States
provides as follows: "No person shall be permitted to trade
with any of the Indians in the Indian country without a li-
cense therefor from a superintendent of Indian affairs, or

Indian agent, or subagent, which license shall be issued for a term of not exceeding two years for the tribes east of the Mississippi, and not exceeding three years for the tribes west of that river."

Section 2133 provides that, "Any person other than an Indian, who shall attempt to reside in the Indian country as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians, or found in his possession, and shall moreover be liable to a penalty of five hundred dollars."

It will thus be seen that a license to reside in the Indian country as a trader, and to trade with the Indians, is a personal privilege of a high official character; so that if C. L. Bristol was the holder of such a license he possessed no right to sell it, either in whole or in part, and a pretended or simulated sale thereof would convey no right or franchise whatever to the purchaser.

After due consideration, I am unable to agree to the distinction sought to be made by counsel between the case at bar and that of *Gould & Kennard v. Kendall & Smith,* 15 Neb., 549. The contract above quoted provides, "That, with the consent of J. W. Paddock, if there is sufficient business, that J. Zaepffel shall be employed at a reasonable salary, to be paid out of the profits of the business." While not fully expressed, this clause evidently means that Zaepffel shall be employed at the site of the trade. And again, "That if at any time J. Zaepffel may think his interests require it he shall have the right to take personal control of the business." Both of these provisions clearly contemplate the introduction of an unlicensed and unauthorized trader into the Indian country, and a clear violation not only of the public policy of the government of the United States but of the letter of the statute above cited.

But, while the evidence might be and I think should have been made fuller and clearer on that point, yet I

think it fairly deducible from the whole evidence that Bristol had no license to trade with the Indians at New Red Cloud agency, or elsewhere. So that whatever view may be taken of the lawfulness or policy of upholding a sale of an interest in an Indian trader's license in a case where the vendor has one to sell, I do not think that it can be seriously claimed that the sale of such license by a party who had none will constitute a consideration for a promissory note.

Having seen to my own satisfaction, at least, that there was no legal and valid consideration for the note in its inception, and that it was void in the hands of the payee, the next question demanding our attention is, whether such facts and the invalidity of the consideration of the note can be inquired into in the present action.

The plaintiff, in and by his petition in the action, as well as by his reply to the answer of the defendants, claims to hold the note sued on as a *bona fide* holder for. value paid therefor, before its maturity, without notice of any infirmity or want of consideration, and in the usual course of business. If it appears from the evidence that the above claim on the part of the plaintiff is true, then he is undoubtedly entitled to recover, notwithstanding the want of consideration for the note as between the original parties. In other words, if the plaintiff is a *bona fide* holder of the note for a valuable consideration at or before it became due, in the usual course of business, without notice of any infirmity therein, the want of consideration for the note between the maker and payee cannot be availed of as a defense to this action.

The evidence leaves no room for doubt that the plaintiff received and became the endorser of the note before maturity, and for a valuable consideration. But did he receive it without notice of the want of consideration for its execution between the makers and the payee? C. L. Bristol, whose deposition was read on the trial and is pre-

served in the bill of exceptions, testified as follows: "I had several conversations with plaintiff, George C. Hobbie, in reference to his taking an interest with me in the New Red Cloud Indian tradership; at last he told me that he would be the responsible party and did not feel like taking the risk but would like to make some money out of it if he could. It was finally proposed that he make a loan of two thousand dollars, for which he should receive four thousand dollars at the end of two years. This he was willing to do, but feared it could not be done legally. He was to have had security for such loan on the property of Joseph Zaepffel and wife.

"Then he (Hobbie) offered to loan two thousand dollars for two years, on condition that Zaepffel and wife should convey to him by absolute deed their Washington county farm, with the understanding that upon payment to him (Hobbie) of four thousand dollars he would reconvey said farm. This proposition Zaepffel refused to accept. The next proposition was that Zaepffel and wife should make two notes to me (C. L. Bristol) of two thousand dollars each, one of which was to be secured by a chattel mortgage on the property of Joseph G. Zaepffel, the other to be secured by a mortgage on Mrs. Zaepffel's farm in Washington county.

" These notes were to be endorsed by me to Hobbie, and sold to him (Hobbie) for the sum of two thousand dollars, and the securities to be duly assigned to him. Hobbie, Zaepffel, and myself were together when this matter was all talked over, and the agreement was finally made to consummate the loan in accordance with the above proposition. Hobbie knew that the only consideration to be received by Zaepffel and wife was a partnership with me in the New Red Cloud Indian tradership. He also knew that the appointment to that tradership was in the name of J. W. Paddock, and the interest I was to have was a partnership interest.

" The notes and mortgages were dated April 12, 1878.

"The notes were endorsed and the mortgages assigned immediately to Hobbie in presence of Zaepffel.  *  *  * Hobbie and he (Hobbie) paid for the notes (amounting to four thousand dollars) two thousand dollars and no more. This whole transaction was had in accordance with the last above named proposition, and for the purpose of avoiding legal difficulties, and to enable him (Hobbie) to receive the four thousand dollars on the loan of two thousand dollars."

The defendant, Joseph G. Zaepffel, was sworn as a witness in his own behalf, and testified as follows:

Q. You are one of the defendants in this case, are you not?

A. Yes, sir.

Q. And the other defendant is your wife?

A. Yes, sir.

Q. Do you know the plaintiff, George C. Hobbie?

A. I do.

Q. How long have you known him?

A. Since this transaction. But previous to that I have known him by sight.

Q. In this transaction, when did you first see him, and how did you come to see him?

A. I knew him by sight. I believe I had my first conversation upon this subject in the street, so far as I remember.

Q. How did you happen to have the conversation?

A. I was anxious that he should go into the co-partnership with his capital. I tried to show him the advantages to him, and he said he would prefer to keep out of it and loan the money.

Q. How did you know anything about it?

A. Mr. Bristol told me that he approached Mr. Hobbie, and there was a probability that Mr. Hobbie would go into it.

Q.    What further negotiation was there?

A.    At that time there was no further negotiation.    The further negotiation took place in the office of    *    *    *

Q.    By Mr. Manderson :    Was that conversation when Mr. Hobbie was present?

A.    Yes, sir; in your office.    Mr. Bristol told me to come up and the papers would be made out and the loan arranged.

Q.    By Mr. Manderson :    Mr. Bristol and you and I were present?

A.    Yes, sir.    The substance was that Hobbie would advance two thousand dollars, and I should assign my farm to him.    I said I would not do it.    He said I would have the farm again on condition that I pay him four thousand dollars.    I would not consent to the arrangement, and I left.

Q.    By Mr. Connell :    What further then occurred ?

A.    I saw no more of Mr. Hobbie until Mr. Bristol made arrangements with Mr. Hobbie in relation to the signing of these four thousand dollars of notes.

Q.    Were you present ?

A.    No, sir.

Q.    How did you come to give the notes and mortgage to Mr. Bristol?

A.    Mr. Bristol told me what arrangements he made with Mr. Hobbie, and I was satisfied when he had his tradership that I could carry out the conditions.

Q.    What was Mr. Bristol to give you for signing the notes and mortgage ?

A.    A half interest.

Q.    By Mr. Manderson :    I sent that in writing?

A.    Yes, sir.

Q.    By Mr. Connell :    State what paper that is, if you know?

A.    That is an agreement between Mr. Bristol and me.

The defendant offers in evidence the agreement referred

to, dated April 12, 1878. Received without objection. (The paper hereinbefore copied.)

Q. The amount of notes stated is four thousand dollars. Was that the amount given? How do you explain that?

A. I don't know exactly, to-day; but I believe there is a mistake. The idea was that there was four thousand dollars to be given, and that the interest which was derived from the two thousand would make four thousand.

Q. What notes did you give for that agreement?

A. These notes that I signed; the first one that we secured by real estate, and then there are four notes of about $380 each. They had to be paid every six months, I believe.

Q. You gave one note for two thousand dollars which is involved in this suit?

A. Yes, sir.

Q. And that was at twelve per cent interest?

A. Yes, sir.

Q. And four other notes at three hundred and eighty dollars each?

A. Yes, sir.

    \*      \*      \*      \*      \*

Q. For all of these notes state whether or not you received any consideration whatever, or did your wife receive any consideration whatever, except the agreement that you refer to?

A. We never got one cent's worth—neither my wife nor I—except this paper.

Q. What, if anything, do you know about Mr. Hobbie being made acquainted with these facts as to what you were to receive for the notes before you gave them?

A. My conversation with Mr. Hobbie only had relation to the fact that Mr. Bristol made him a proposition to enter into a partnership, and that he didn't accept it.

Q. What reason did he give for not accepting it?

A.   Because he thought it was safer to stay in Omaha and loan his money.

Q.   Was that before or after you gave the notes?

A.   It was before the notes were signed.

I transcribe below so much of the testimony of the plaintiff (who was sworn as a witness on his own behalf) as bears on the point which we are now considering:

Q.   When was you first approached in reference to this transaction?

A.   Along early in 1878—just before this, I think; along in the early summer, may be.

Q.   Where was it that you had the first interview with Mr. Zaepffel in regard to advancing money on purchasing paper?

A.   I had no interview with the professor until after the transaction was completed.

Q.   When and where was the first interview that you remember being had with the professor?

A.   It was at the hotel—no particular interview. It happened sort of accidentally, and merely alluded to the fact that the matter was consummated; that was about all.

Q.   What, if anything, did you know at that time with reference to Mr. Bristol having a license to trade at an Indian reservation?

A.   Only what he intimated to me—that he had a pretty sure thing of getting a tradership of this kind; he was pretty certain of getting the appointment.

Q.   How much money did you advance to Mr. Bristol for this purpose?

A.   Two thousand dollars for this purpose.

Q.   What did you receive?

A.   I received a note of two thousand dollars and four other notes of three hundred and eighty dollars each. Three thousand five hundred and twenty dollars altogether.

Q.   And these notes were secured by two mortgages that have been referred to?

A.   Yes, sir.

Q.   What was the security?

A.   The note for $2,000 was secured by the real estate mortgage on the farm property.

Q.   The notes for $1,520 were secured by a mortgage on the wine?

A.   Yes, sir.

\*          \*          \*          \*          \*

Cross-examined by defendants' counsel.

\*          \*          \*          \*          \*

Q.   Hadn't you had some talk with Mr. Bristol before you met Mr. Zaepffel about this proposed post tradership?

A.   Yes, sir.

Q.   Didn't you at first talk of taking a direct interest in that with Mr. Bristol?

A.   That proposition was made to me.

Q.   You knew at the time that he hadn't the post tradership, but expected he would get it?

A.   I didn't know anything about it.

Q.   You knew he hadn't it?

A.   Not at that time.

Q.   . Didn't you know that he proposed to get it?

A.   All I knew was what he told me; I had no knowledge upon the subject.

Q.   You knew from what he told you that he would probably get it?

A.   Yes, sir.

Q.   But that he hadn't it at that time?

A.   That was my understanding, that he had a sure thing.

Q.   You didn't think he had a sure thing?

A.   I certainly did.

Q.   Why didn't you go in with him?

A.   Because I didn't want to go into business with him. I didn't want to go into business with any such man.

Q.   The objection was the man?

A.    Certainly ; I had no objection to the business.

\*        \*        \*        \*        \*

Q.    How long had you been talking with Mr. Bristol about this post tradership and matters in connection with it before these notes were executed ?

A.    Two or three months.

Q.    How frequently would you have interviews with him before you saw Professor Zaepffel ?

A.    When we casually met on the street, may be half a dozen times.

Q.    Didn't you frequently see him in his or your office?

A.    No, sir.

Q.    Didn't you ever meet him in either of your offices ?

A.    I don't remember.

Q.    You think your meetings were generally on the street ?

A.    Yes; he lived near me.

\*        \*        \*        \*        \*

Q.    Did you propose to advance the four thousand dollars ?

A.    That was his proposition to me.

Q.    State why you had notes and mortgages made in the first place to Mr. Bristol.    Why didn't you have them made to yourself direct ?

A.    I cannot say; it was a proposition of Mr. Bristol's.

\*        \*        \*        \*        \*

Q.    Can you give any other reason than the one stated for having the note and mortgage given through Mr. Bristol ?

A.    I didn't know of any other reason at the time.

Q.    Was not the reason to get over the statute relating to usury ?

A.    It might have been with Mr. Bristol.

Q.    It was not with you?

A.    No, sir.

Q.    Might it not have been ?

A.　It might have been.

Q.　You would not want to swear that that was not the purpose?

A.　No, sir.

From an examination of the above evidence it can scarcely be doubted that the want of consideration for the making of the note was as well known to Hobbie at the time of its endorsement to him as it was to Bristol. I am not unmindful of the fact that the district court before whom this cause was tried rendered a decree for the plaintiff, and in holding, as I think this court must, that the plaintiff is chargeable with notice of all the facts connected with the inception of the note, we are in entire accord with the district court, which, having held the note to be usurious as between the plaintiff and the Zaepffels,. must have done so on the ground that Hobbie had knowledge of the consideration, or rather of the want of consideration, for which the note was given. The following is the finding of the district court as copied from the record:

"The court finds that the defendants, Joseph G. Zaepffel and Elizabeth Zaepffel, executed and delivered to Cicero L. Bristol the note and mortgage sued on in this action, and that the same were duly assigned to the plaintiff as described in the plaintiff's petition. And the court further finds that the transaction was in fact a loan of money by plaintiff Hobbie to the defendant, Joseph G. Zaepffel, and that the same was usurious." *　　*　　*

Under the rule universally adhered to by this court, of sustaining the finding of the trial court as well as the verdict of the jury, except in cases where such finding or verdict is so unsustained by or contrary to the evidence as to be clearly wrong, the above finding would probably be upheld if it was in accordance with the pleadings. But in that respect it is clearly unsustained.

As we have seen, the plaintiff declares as the holder of a negotiable promissory note received by him before ma-

turity, for value, without notice of its invalidity. The maxim that the decree must be *secundum allegata* as well as *secundum probata*, says Chief Justice Marshall, "is essential to the due administration of justice in all courts. The rule is founded in sound reason and good sense, and is no doubt fully applicable to our present system of pleadings." Moak's VanSantvoord's Pleadings, p. 787, and authorities there cited.

But upon the facts as shown by the bill of exceptions I do not think there was any lawful consideration for the note, nor that the plaintiff is such *bona fide* holder as to entitle him to recover thereon under any condition of pleadings.

The judgment of the district court is therefore reversed and the cause dismissed.

JUDGMENT ACCORDINGLY.

The other judges concur.