JACKSON *v.* McLEAN *et al.*

(*Circuit Court, E. D. Missouri, E. D.* October 18, 1888.)

CONTRACTS—PUBLIC POLICY—EQUITY—ACCOUNTING.

J. & M. formed a partnership to build a railroad, and to that end caused a railroad corporation to be formed under the general laws of the state of Illinois. J. was one of the directors, and the other directors were clerks of M. The bill averred that all of the directors acted at the dictation of J. & M., and were in fact merely their agents. Such board of directors awarded the contract for building the railroad to J. & M., agreeing to give them all the stock of the corporation and first mortgage bonds of the company, issued at the rate of $15,000 per mile. This contract was taken nominally by third parties, but in reality for the benefit of J. & M. On a bill filed by J. against the legal representatives of M., to obtain an account of the profits of the partnership growing out of a partial execution of the contract for constructing the road, *held*, that the contract was fraudulent, and against public policy, and that a court of equity would not entertain the suit for an accounting, even as to the profits actually realized by M. up to the time he abandoned the enterprise. The case distinguished from *Brooks* v. *Martin*, 2 Wall. 78.

In Equity. On demurrer to bill.

*Minor Meriwether*, for complainant.

*Fisher & Rowell*, for defendants.

THAYER, J. The question that arises on the demurrer to the bill is whether the relief prayed for by the complainant ought to be denied, on the ground that the demand sought to be enforced grows out of an illegal or immoral contract or transaction, to which the complainant was a party. The decision of this question involves a statement at some length of the material allegations of the bill, which is very lengthy. I shall only state the substance of the pleading, mainly in my own language. The com-

plainant avers that, in the life-time of Dr. James H. McLean, he entered into an agreement with him to construct a railroad from Carbondale, Ill., southwardly, to a point on the Ohio river, near Paducah, Ky., and eventually to extend it northwardly from Carbondale to the city of St. Louis. The arrangement entered into contemplated that complainant and McLean should be partners in the enterprise, and divide whatever profits were realized from the venture. To enable them to build the road it was agreed that they would organize a corporation, the entire capital stock of which should be divided equally between McLean and the complainant, Jackson, and should be held by them either in their own names, or in that of their agents or friends. It appears that, pursuant to such agreement, a railroad corporation was formed under the general incorporation laws of the state of Illinois, but the bill states with great candor that the corporation so formed was designed to be used and controlled "by complainant and McLean, in every legal and legitimate manner, as an adjunct for the accomplishment of their partnership enterprise;" that the persons who signed the articles of association, and subsequently acted as the board of directors of the corporation, (other than complainant, who was an incorporator and director,) had no "substantial interest in the corporation, or in the enterprise in which it was engaged;" that complainant and McLean set apart to each of said directors one share of stock to render them eligible as directors; that they never paid for the stock, or promised to pay for it; and that "each and all of the directors acted throughout the business, at the request of complainant and McLean, nominally for themselves, but in truth and in fact as the agents of and for the sole use and benefit of complainant and McLean, who were to own the entire capital stock of the company in equal parts." After the corporation was organized, the directors of the same, acting at the dictation of Jackson and McLean, the so-called partners, entered into a contract with them for the construction and equipment of the railroad in question. This contract was signed on one side by complainant's son and by a confidential clerk of McLean's, but it is alleged with great care that they were financially irresponsible, and that in signing the contract they acted merely as the chosen representatives or agents of Jackson and McLean, respectively, who were the real contractors and were to have whatever profit was realized from the undertaking. By the terms of the construction contract the contractors were to receive for building the road all of the capital stock of the corporation, which was to be issued at the rate of $16,000 per mile for each mile of completed road, and all of the mortgage bonds of the company, which were to be issued at the rate of $15,000 per mile, and all donations of land, municipal bonds, or other property that might be made to the corporation in aid of the enterprise. The foregoing plan of building a railroad in the name of the corporation, and under the guise of a contract with it, was a plan devised by the attorney of Jackson and McLean, as the bill states, and it was adopted by them, as the bill also states, "in order to reap for themselves the profits to be earned from the construction of said road." The bill further alleges that Jackson and McLean, having acquired the contract for the

building and equipment of the road, in manner and form before stated, through the agency of subcontractors, began the construction of that section of the road lying south of Carbondale, and prosecuted the work together for several months. McLean, as it appears, was to advance the money necessary to pay subcontractors for building the first 25 miles of that section of the road, and was also to furnish them with adequate supplies, while the complainant was to superintend the practical operations in the field. After about 25 miles of track had been graded, according to this arrangement, a difficulty arose between Jackson and McLean with respect to the prices which the latter had charged the firm for supplies furnished to subcontractors. The result of the difficulty was that Jackson was ousted from the firm by McLean, and was not allowed to participate further in the joint enterprise. McLean thereupon caused himself to be elected director and president of the corporation, as the bill states, by means of the "absolute control" which he exercised over the other directors, two of whom appear to have been his clerks. He also took possession of all the books and accounts of the firm of Jackson & McLean, and caused the corporation to execute a mortgage and mortgage bonds on all of its property, including the 25 miles of road-bed that had been built by said firm, and received in such mortgage bonds $375,000 for the 25 miles of road-bed so constructed by the firm. The bill next avers that the actual cost of said 25 miles of road, including equipment, did not exceed $250,000, and that, after McLean was reimbursed out of the $375,000 by him received for all expenditures made by him on account of the firm, he still had in his possession $68,749 of firm money, one-half of which belongs to complainant. The complainant also charges that if McLean had faithfully complied with the agreement entered into between them, as before recited, and the entire division south of Carbondale had been completed, a further profit in the sum of $40,500 would have been realized by the firm. In view of the premises complainant prays that an account be taken of all the transactions between himself and McLean under the alleged agreement for the construction of the railroad in question, and that McLean's legal representatives may be decreed to pay what is found to be due him, both on account of profits actually realized and that might have been realized if the division south of Carbondale had been fully completed, and the enterprise had not been abandoned by McLean.

From the foregoing statement of the contents of the bill it appears that the profits of the enterprise, to which the complainant lays claim, and with respect to which he desires to have an account taken, were all realized from a contract made by himself and McLean with the railroad corporation, for the building and equipment of its road, and beyond all question that contract was constructively fraudulent. Complainant himself was one of the directors of the corporation when the contract was executed. The remaining directors were clerks of McLean, who had become directors at his request, merely to represent his interest and execute his orders. They had no personal interest in the corporation or in the enterprise in which it was engaged, and were not even the beneficial

owners of the respective shares of stock that stood in their names.  According to the showing made by the bill, Jackson and McLean were the real managers and directors of the company, but, notwithstanding that fact, they caused the company to enter into a contract with themselves, or, rather, with their representatives, for the building and equipment of the road, by which the company parted with all of its stock, mortgage bonds, and other available assets, for what plainly appears to have been an inadequate consideration.  The contract was manifestly an improvident one, so far as the corporation was concerned, but, without reference to that fact, it was obviously fraudulent and unlawful, for the reason that both Jackson and McLean, by virtue of their relation to the corporation, were incapable of making an agreement with it.  It is hardly necessary to add that the law would lend no sanction to the agreement made by them with the corporation, even though the bargain had not been detrimental to the company.  The position which they occupied precluded them from taking the contract for the construction of the road. *Wardell* v. *Railroad Co.*, 103 U. S. 651, and 4 Dill. 330; *Thomas* v. *Railway Co.*, 1 McCrary, 392, 2 Fed. Rep. 877; *Poor* v. *Railway Co.*, 59 Me. 270–277; *Railroad Co.* v. *Kelly*, 77 Ill. 426; *Railway Co.* v. *Blakie*, 1 Macq. 461; *Railway Co.* v. *Magnay*, 25 Beav. 592.  I ought to further say in this connection that the parties to the partnership agreement seem to have had no proper conception of the *quasi* public character of railroad corporations, or of the manner in which the law requires them to be controlled and used.  They seem to have acted on the assumption that they can be properly used merely as an instrument to further the interests and enhance the profits of a private partnership.  In view of what has been said it is evident that complainant is confronted by the salutary rule of law which forbids a court to lend any aid in the enforcement of contracts that are either unlawful, immoral, or opposed to public policy.  The same rule, as generally understood, also precludes a court from entertaining a suit between persons who have been concerned in an unlawful transaction, the purpose of which is to compel an accounting with respect to profits that may have accrued from such illegal transaction.  *Snell* v. *Dwight*, 120 Mass. 9; *Watson* v. *Murray*, 23 N. J. Eq. 257; *Green* v. *Corrigan*, 87 Mo. 359; *Gould* v. *Kendall*, 15 Neb. 549, 19 N. W. Rep. 483; *Sykes* v. *Beadon*, 11 Ch. Div. 196; *Cook* v. *Sherman*, 4 McCrary, 24–28, 20 Fed. Rep. 167,  In the present case it will be observed that the court is not only asked to compel the defendants to account for profits actually realized under the fraudulent contract, but to compel them to account for profits that might have been realized, if McLean had not abandoned the work, and refused to proceed further with the enterprise when the contract had only been partially executed.  In other words, the court is asked to enforce an immoral contract by compelling one of the parties thereto to respond in damages for refusing to execute it.  A proceeding of such character must, of course, be dismissed as wholly without merit.  It may, perhaps, have been thought that the decision in *Brooks* v. *Martin*, 2 Wall. 78–82, would at least justify the court in taking an account of the profits that had actually accrued when McLean abandoned the en-

terprise. I entertain a different view of the scope of that decision. In that case a bill was filed by a partner to set aside a sale of his interest in a firm that had been brought about by the fraudulent representations or conduct of a copartner to whom the sale was made. It also prayed for an accounting and division of the firm assets. It appeared that the original partnership agreement was unlawful in that it contemplated, to some extent at least, the purchase of soldiers' claims for land warrants, before warrants were issued, which was forbidden by an act of congress, but was not otherwise immoral. The court sustained the bill, and granted the relief prayed for, apparently upon the ground that the illegal contract was fully executed, and that it was not necessary to enforce the same, or inquire as to the manner in which the firm property, consisting of money, notes, and lands, had been acquired. That case has heretofore been construed as holding, in effect, that suits may be maintained to recover money that may have issued from an illegal transaction, when the transaction has been fully consummated, and the proceeds thereof have been received and carried to the credit of the plaintiff, so that he can show a title to the fund claimed without reference to the illegal transaction out of which it may have originated. *Bank* v. *Bank*, 16 Wall. 499, 500; *Cook* v. *Sherman, supra.* That case will not justify the court in entertaining the present suit, and the demurrer is accordingly sustained.